IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CASSANDRA M. MENOKEN,<br>131 Tennessee Avenue NE<br>Washington, D. C. 20002, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) ) | |
| CAROLYN N. LERNER, Special Counsel<br>U.S. OFFICE OF SPECIAL COUNSEL,<br>in her official capacity as well as her<br>successors or assigns,<br>1730 M Street NW Suite 218<br>Washington, D.C.20036-4545 | ) ) ) ) ) ) ) | Civil Action No: |
| Defendant. | ) ) | |

**PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF
PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT
AND MANDAMUS STATUTE**

<u>PRELIMINARY STATEMENT</u>

1.      Plaintiff brings this action seeking declaratory and injunctive relief as a result of

Defendant's refusal to comply with 5 U.S.C. §1213 -- a law she is duty bound to administer, as

written.  Plaintiff seeks an order compelling Defendant – and those whom she directs – to perform

required ministerial acts in response to Plaintiff's "Disclosure" of wrongdoing by high level

officials in the executive branch of the federal government.

2.      Plaintiff's Disclosure meets the criteria of §1213 (a); yet, Defendant has refused to

process it under §1213 (b) and (c), as required.  Defendant wrongly believes she has discretion to

exempt certain wrongdoing from §1213's reach.  Therefore, this action also seeks an order declaring

that she exceeded her authority when she "closed" Plaintiff's Disclosure pursuant to a policy not

authorized by Congress, and that she is duty bound to process it consistent with §1213's plain terms.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361 because this action

arises under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*  Venue is proper under

28 U.S.C. §1391 (e) (l) since substantially all of the acts and omissions giving rise to Plaintiff's

claim occurred in the District of Columbia.

## PARTIES

4.     Plaintiff Cassandra M. Menoken is an African American attorney who resides in the

District of Columbia.  At all times material to this action, she has been an employee of the United

States Equal Employment Opportunity Commission (EEOC), an executive branch agency that

adjudicates employment discrimination claims against federal agencies (including itself).

5.     At times material to this action, Plaintiff was also an applicant for employment as a

federal administrative law judge (ALJ). The United States Office of Personnel Management

(OPM) is the executive branch agency in charge of the federal ALJ Program, including the

application and selection process. Although OPM does not employ ALJs, it functions as the

"gatekeeper" for about 30 agencies that do.

6.     Defendant Carolyn Lerner is United States Special Counsel and head of the U.S.

Office of Special Counsel (OSC), the agency charged with administering 5 U.S.C. §1213 -- a law

Congress passed to promote integrity, efficiency and accountability in the executive branch of the

government through a procedure that delineates the actions OSC "shall" take and "may" take in

response to  a "disclosure" alleging a violation of "law, rule, or regulation" and/ or "gross

mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to

public health or safety" (collectively referred to herein as "wrongdoing").

## BACKGROUND

### *CONTEXT OF PLAINTIFF'S §1213 DISCLOSURES*

7.      Plaintiff was a prevailing party in an EEOC adjudicatory proceeding captioned Menoken v. OPM, EEOC No. 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X (hereafter the "Menoken Matter").

8.      In the Menoken Matter proceeding, Plaintiff litigated race and gender claims against OPM arising from her experience as a participant in the ALJ selection process.

9.      In November 2000, EEOC ruled that OPM was liable under Title VII for discriminating against African American ALJ applicants.

10.     Specifically, EEOC found that African American applicants had long been denied an equal opportunity to receive ALJ appointments due to OPM's use of an invalid examination scoring factor that correlated with race.  An applicant's score on the ALJ examination is extremely important.

11.     Under OPM's rules, a score differential of **$1/100^{th}$ of a point** often made the difference in whether an applicant would even be *considered* for an ALJ appointment.   A differential of **$1/10^{th}$ of a point** often determined whether an applicant could be appointed.

12.     In an Order entered November 9, 2000, EEOC directed OPM to immediately "cease" use of the racially harmful scoring factor.

13.     In an Order entered June 29, 2001, EEOC clarified that the prohibition against "using" the unlawful scoring factor also barred OPM from *relying* on it – or *allowing* any other agency to rely on it  -- for any ALJ employment purpose.

14.     EEOC's June 2001 Order also required OPM to eliminate any lingering effects of its discriminatory practices before allowing future ALJ appointments (or non-appointments) to occur on the basis of scores received on the racially tainted examination.

15.     EEOC later clarified that appropriate relief for OPM's Title VII violation required that OPM increase the examination scores of African Americans on the ALJ "Register" in 2001, who (like Plaintiff) were presumptively harmed by the unlawful scoring factor.

16.     OPM had a statutory duty to comply with EEOC's Orders in the Menoken Matter.

17.     EEOC had a statutory responsibility to ensure OPM's compliance with the Orders.

18.     At all times material to this action, Plaintiff has had a reasonable basis to believe that, in and after 2001, OPM violated section 717(b)(3) of Title VII by failing to comply with the Menoken Matter Orders and undertaking, instead, to further harm African American ALJ applicants (including Plaintiff) by *continuing* to use, and rely on, the scoring factor EEOC had banned.  In 2008 and 2011, three OPM officials gave sworn testimony to this effect.

19.     At all times material to this action, Plaintiff has also had a reasonable basis to believe that, after 2001, EEOC "politicized" the Menoken Matter and violated binding ethics rules by failing to adjudicate Plaintiff's "noncompliance" appeals in an ethically principled way.   EEOC's unwavering commitment *not* to enforce the Menoken Orders (regardless of OPM's admissions) is a matter of public record. See e.g. Menoken v. Director, OPM, 2012 WL 3060035 (E.E.O.C.) (denying request to reopen due to OPM's success in misleading the court about compliance).

20.     OPM admitted that high level political appointees within OPM and EEOC engaged in *ex parte* communications while Plaintiff's 2001 noncompliance appeal was pending adjudication by EEOC.  Since making that admission, neither OPM nor EEOC has been willing to disclose the content or extent of their communications regarding the Menoken litigation.  Both objected when Plaintiff sought full disclosure thereof, with OPM insisting its *ex parte* communications with EEOC on the Menoken Matter are protected by the "litigation privilege."

21.     In May 2003, EEOC dismissed Plaintiff's 2001 appeal professing to be "reasonably satisfied" that OPM had complied with the Menoken Orders.  EEOC made the facially tenuous ruling without requiring OPM to submit *any* evidence substantiating its compliance *argument*.

22.     In the years following the dismissal of her 2001 appeal, Plaintiff repeatedly reminded EEOC of its duty to hold OPM accountable for continuing to discriminate against African American ALJ applicants after being ordered to "cease."  By 2012, it had become clear her efforts had only strengthened EEOC's resolve to cover up OPM's transgressions.  It had also become clear that Plaintiff would pay a heavy price in her EEOC employment for not letting the issue go.

### PLAINTIFF'S SECTION 1213 DISCLOSURES AND OSC'S RESPONSE

Plaintiff's Encounter With OSC in 2012

23.     In August 2012, pursuant to 5 U.S.C. §1213, Plaintiff filed a "Disclosure" with OSC reporting that officials in OPM and EEOC had violated Title VII and binding ethics regulations (among other laws). The Disclosure included a description of abusive and unlawful acts.

24.     On August 15, 2012, OSC attorney, Jennifer Pennington, called Plaintiff to advise that her Disclosure would not be processed because of OSC's policy of not getting involved in matters relating to EEOC's adjudicatory activities.   Pennington told Plaintiff not to bother forwarding information substantiating her wrongdoing allegations.

25.     Convinced Pennington had misunderstood the nature of the wrongdoing she sought to report, Plaintiff revised her Disclosure and resubmitted it, with additional information, to make clear that she was *not* seeking help in pursuing a discrimination claim. She further clarified (among other things) that the ripple effect of OPM's and EEOC's abuses had caused extraordinary suffering and harm to hundreds of thousands of Americans seeking disability benefits from the Social Security Administration (SSA), the agency that employs the largest number of ALJs.

26.    On September 10, 2012, Pennington contacted Plaintiff to emphasize that OSC would not "allow" its "1213 authority" to be used to address wrongdoing, *of any type*, arising from EEOC's adjudicatory activities. Once again, she advised Plaintiff not to submit substantiating information.

27.    By letter dated September 25, 2012, Plaintiff was advised of OSC's decision to "close the file" on her Disclosure upon concluding it would be "more appropriate" for the alleged wrongdoing to be addressed by EEOC. OSC was aware, at the time, that Plaintiff had already raised her concerns with EEOC (including its Inspector General) only to have them repeatedly ignored.

28.    By letter dated October 10, 2012, Plaintiff protested OSC's flawed handling of her Disclosure, noting the conspicuous absence of any mention, in Pennington's  letter, regarding the "likelihood" that an investigation would confirm that the alleged ethics and Title VII violations had occurred,  OSC was required to make such a determination, under §1213(b), but did not.

.    29.    OSC's silence on the "likelihood" question was a misguided attempt to avoid the ministerial mandates of §1213(c); avoidance was necessary to accommodate Defendant's policy of exempting certain wrongdoing from §1213's reach.

30.    OSC is mindful of the statute's mandate that wrongdoing reported by a covered whistleblower (like Plaintiff), meeting the "likelihood" standard of §1213(b), *must* be referred to the relevant agency head, per the requirements of subsection (c)(1).

31.    To accommodate the "exemption" Defendant created for EEOC related wrongdoing, OSC believed it could circumvent the mandate of subsection (c)(1) by simply not performing the subsection (b) "likelihood" review of  Plaintiff's Disclosure or by performing the review and failing to acknowledge the positive result thereof.

32.    OSC cannot avoid the ministerial acts prescribed under subsection (c) by ignoring the ministerial acts prescribe under subsection (b) because *both* contain mandatory language.

33.     Subsection (b) provides that disclosures submitted under subsection (a) (as Plaintiff's was) "shall" be assessed to determine the likelihood an investigation would confirm the alleged wrongdoing occurred.

34.     In the days and weeks following the dismissal of her Disclosure, Plaintiff attempted to discuss her concerns with senior level OSC officials. However, her emails and phone messages were ignored, except in one instance where an official advised of his decision to "recuse" himself, on the curious ground that he had collaborated with EEOC on an unrelated matter *in the past*.

Plaintiff's Encounter With OSC in 2015

35.     In 2015, Plaintiff retained counsel in a renewed effort to persuade OSC to process her Disclosure in the manner prescribed by §1213.

35.     In a May 13, 2015 letter, directed to the Defendant, counsel advised of Plaintiff's intent to file a civil action if OSC did not reopen her Disclosure for a proper "1213" review.

36.     Although Defendant chose not respond to or acknowledge counsel's May 13 letter, attorney Pennington did call to advise that she would "informally" reopen Plaintiff's Disclosure to consider the sufficiency of her prior review.

37.     Pennington was advised that, in light of intervening events, it would be appropriate that OSC consider the reported wrongdoing of EEOC and OPM separately. She was further advised that Plaintiff would submit supplemental information as to each - beginning with OPM.

38.     On or about June 29, 2015, Plaintiff submitted a verified Declaration (with exhibits) in further support of her assertion that OPM had violated §717 of Title VII by failing to comply with the Menoken Matter Orders, and had *also* violated 18 U.S.C. §1001 by falsely asserting otherwise in EEOC proceedings and in response to inquiries from members of Congress.

39.     Plaintiff's June 2015 Declaration incorporated the sworn testimony of three OPM officials who, after years of agency denials, finally admitted to facts establishing that OPM had never corrected its discrimination against African American ALJ applicants and had continued to use (and rely on) the racially harmful scoring factor long after being ordered to "cease."

40.  On or about May 5, 2016, attorney Pennington called Plaintiff's counsel to advise that, after reviewing Plaintiff's Disclosure, including the supplemental evidence submitted in 2015, OSC saw no reason to change its previously stated view that the wrongdoing in question would be more appropriately addressed elsewhere.

### *ALL AVENUES OF POSSIBLE RELIEF HAVE BEEN EXHAUSTED*

41.     Plaintiff has exhausted all reasonable avenues of relief and accountability in her efforts to address the wrongdoing by EEOC and OPM, including the following (with no success):

- EEOC's Inspector General (IG) (multiple contacts--no response);
- OPM's IG; (multiple contacts -- no response);
- SSA's IG (multiple contacts--no response); [1]
- Office of Government Ethics (denied any responsibility to address ethics violations—advised Plaintiff to contact OSC);
- Council of Inspectors General for Integrity and Efficiency (cited lack of authority to address alleged wrongdoing by EEOC, OPM, SSA and OSC);
- Members of Congress and Congressional Committees (multiple contacts—either no meaningful response or no response at all); and
- Government Accountability Office (multiple contacts -- no response)
- federal courts (action dismissed on summary judgment after court credited OPM's factual misrepresentations regarding its compliance with the Menoken Orders)

### RELEVANT STATUTORY FRAMEWORK

42.     The APA authorizes the Court to set aside and hold unlawful agency action found to be arbitrary and capricious and not authorized by law.  It further authorizes the Court to compel action unlawfully withheld by a federal agency. See 5 U.S.C. §706.

---

[1] SSA is OPM's largest ALJ stakeholder, employing more than 75% of the ALJs in the government.

43.     Mandamus is an available remedy where an agency adopts a policy and practice of picking and choosing the circumstances in which it will perform statutorily mandatory actions. See 28 U.S.C. §1361.

## CLAIM FOR RELIEF

44.     Plaintiff incorporates paragraphs 1 through 43, as applicable, and states that she is entitled to relief because she has been harmed by Defendant's arbitrary and unlawful refusal to process her Disclosure in the manner mandated by 5 U.S.C. §1213.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide the following relief:

a)     an Order declaring that OSC exceeded its authority when it "closed the file" on Plaintiff's Disclosure pursuant to Defendant's policy of exempting EEOC wrongdoing from §1213's reach, and that §1213 must be administered consistent with its terms and Congressional intent.

b)     an Order setting aside OSC's decision "closing the file" on Plaintiff's Disclosure;

c)     an Order compelling Defendant – her successors and those whom she directs – to reopen Plaintiff's Disclosure for processing that accords with §1213 (b) and (c);

d)     an award of attorney's fees and cost; and

e)     such other relief as may be warranted and just.

Respectfully submitted,

Gary T. Brown, Esquire
D.C. Bar No. 246314
GARY T. BROWN & ASSOCIATES
1717 K Street N.W. Suite 900
Washington, D.C. 20006
Tele: (202) 393-4900
Fax:  (202) 776-0136
GTBFirm@GaryTBrown.com