# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASSANDRA M. MENOKEN, <br><br> Plaintiff, <br><br> v. <br><br> ADAM MILES, in his official capacity as Acting Special Counsel, U.S. Office of Special Counsel, <br><br> Defendant.[1] | Civil Action No. 16-2071 (JDB) |

## MEMORANDUM OPINION

For more than two decades, plaintiff Cassandra M. Menoken has been litigating claims that the Office of Personnel Management (OPM) unlawfully discriminated against African Americans, including herself, in its administration of the Administrative Law Judge (ALJ) examination and selection process. In November 2000, the U.S. Equal Employment Opportunity Commission (EEOC) found that the 1993 ALJ examination included a scoring factor—awarding points for partnership in a large law firm—that had an unlawful disparate impact based on race. EEOC ordered OPM to cease use of that scoring factor. In August 2012, Menoken filed a disclosure pursuant to 5 U.S.C. § 1213 with the Office of Special Counsel (OSC), an independent federal agency authorized to receive disclosures of wrongdoing, alleging that OPM continued to use the unlawful scoring factor and that EEOC refused to enforce its order. Dissatisfied with OSC's handling of her disclosure, Menoken filed this lawsuit under the Administrative Procedures Act (APA), seeking mandamus, declaratory, and injunctive relief requiring OSC to reopen her

---

[1] Per Federal Rule of Civil Procedure 25(d), Acting Special Counsel Adam Miles has been substituted for former Special Counsel Carolyn Lerner.

1

disclosure and process it in accordance with the requirements of 5 U.S.C. § 1213. OSC moved to dismiss this lawsuit on the grounds that Menoken lacks standing, her APA claims are precluded by the Civil Service Reform Act, and she has not shown that she is entitled to mandamus relief. See Def.'s Mot. to Dismiss [ECF No. 11–1].[2] Because the Court finds that Menoken lacks standing, OSC's motion to dismiss will be granted.

## I. BACKGROUND

Menoken is an African-American attorney who "[a]t all times material to this action" has been employed by the EEOC, an executive branch agency charged with, among other things, adjudicating employment discrimination claims filed by federal employees and applicants. Am. Pet. ¶ 4. OPM is the federal agency that administers the selection of ALJs and maintains a register of candidates eligible for placement. Id. ¶ 5; see Menoken v. Whipple, 605 F. Supp. 2d 148, 150 n.1 (D.D.C. 2009) (Menoken I), aff'd sub nom. Menoken v. Berry, 408 Fed. App'x 370 (D.C. Cir. 2010) (per curiam). Menoken participated in the 1993 ALJ examination, but she was not selected for a position. Menoken I, 605 F. Supp. 2d at 150; Am. Pet. ¶ 8. Since then, she has engaged in persistent litigation against OPM.

### A. Menoken's Claims Against OPM

In 1994, Menoken filed an EEOC complaint alleging that: the 1993 ALJ selection process violated Title VII of the Civil Rights Act because it had a disparate impact on African American and female applicants, OPM discriminated against her based on her race and sex, and OPM retaliated against her for challenging the ALJ selection process. Menoken I, 605 F. Supp. 2d at 150. In November 2000, EEOC ruled for OPM on all but one of Menoken's claims. Id. Menoken

---

[2] OSC's motion to dismiss the original petition, see Def.'s Mot. to Dismiss [ECF No. 8], was filed prior to the filing of the amended petition, see Am. Pet. [ECF No. 10]. It will therefore be denied as moot. See Barnes v. District of Columbia, 42 F. Supp. 3d 111, 117 (D.D.C. 2014) (filing of amended complaint supersedes original complaint and any pending motion to dismiss becomes moot).

2

prevailed on her claim that OPM had used an improper scoring factor in the 1993 ALJ examination, specifically a benchmark that awarded applicants additional points for partnership in large law firms (the "partner benchmark"). Id. EEOC determined that the partner benchmark created an unlawful disparate impact on the basis of race, and ordered OPM to cease use of the benchmark. Id.; see Am. Pet. ¶¶ 9–12. OPM was further ordered to post and provide notice to those agencies which request ALJ certificates of the finding that the 1993 ALJ examination relied on a discriminatory benchmark. See Ex. 2 to Def.'s Mot. to Dismiss [ECF No. 11-3] (Menoken v. Cohen, No. 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X (EEOC June 29, 2001)) at 27. In a June 2001 remedial order, EEOC barred OPM, or any other agency, from relying on the partner benchmark "for any ALJ employment purpose." Am. Pet. ¶ 13. The remedial order also required OPM to correct any lingering effects of its race discrimination prior to allowing future ALJ appointments to occur on the basis of the "scores assigned under the tainted examination." Id. ¶ 14. EEOC later clarified that OPM was required to raise the scores of African Americans on the ALJ register who were presumptively harmed by the partner benchmark. Id. ¶ 15. EEOC determined that Menoken was not entitled to any individual relief because, even accounting for the effect of the partner benchmark, she would not have been selected for an ALJ position. See Ex. 2 to Def.'s Mot. to Dismiss at 27–28.

Shortly thereafter, Menoken filed appeals challenging EEOC's findings and conclusions and OPM's compliance with the remedial order. See Ex. 3 to Def.'s Mot. to Dismiss [ECF No. 11-4] (Menoken v. James, Nos. 01A15194, 01A14969 (EEOC May 16, 2003)) at 1, 7. In May 2003, EEOC issued a decision upholding its findings and conclusions, and rejecting Menoken's noncompliance claim because it was "reasonably satisfied that [OPM] took appropriate steps in a timely manner to promptly adhere to and implement the directives of the [EEOC administrative

judge]." Id. at 8; see Am. Pet. ¶ 21. Menoken filed a request for reconsideration of this decision. See Menoken v. James, No. 05A30918, 2005 WL 38762, at *2 (EEOC Jan. 3, 2005).

In August 2003, while her reconsideration request was pending, Menoken filed a Title VII lawsuit against OPM in this court, raising substantially similar claims as her prior EEOC complaints, including that: (1) OPM failed to comply with the remedial order, which required that OPM cease and correct unlawful discrimination against African American applicants caused by the partner benchmark; (2) the ALJ examination unlawfully discriminated against African Americans in general and her in particular; and (3) the ALJ selection process unlawfully discriminated against female applicants in general and her in particular.[3] Menoken I, 605 F. Supp. 2d at 151. In March 2009, the court granted OPM's motion for summary judgment on all claims, finding OPM "provided abundant admissible evidence substantiating its full compliance with [EEOC's] order to cease and correct the discrimination caused by the partner benchmark." Id. at 152. The D.C. Circuit affirmed this decision and concluded that "the record reveals no evidence to suggest that OPM continued to use the partner benchmark after the [AJ's] 2000 ruling." Menoken, 408 F. App'x at 373.

In December 2011, Menoken filed a renewed request for EEOC to reconsider her 2001 merits and noncompliance appeals. EEOC declined because her "allegations regarding OPM's alleged non-compliance and deception were fully litigated in federal district court." Menoken v. Berry, No. 0520120172, 2012 WL 3060035, at *5 (EEOC July 11, 2012).

---

[3] While her Title VII action was pending in this court, Menoken continued to pursue the matter with EEOC by filing additional noncompliance appeals raising similar claims. EEOC dismissed these noncompliance appeals, along with Menoken's 2003 request for reconsideration, pursuant to 29 C.F.R. § 1614.409, which states that the filing of a civil action terminates EEOC's processing of an appeal. See Menoken v. James, 2005 WL 38762, at *2–4 (dismissing requests for reconsideration and compliance appeal); Menoken v. Springer, No. 0120053271, 2007 WL 2228816, at *4–5 (EEOC July 26, 2007) (dismissing two compliance appeals, but vacating a grant of summary judgment in favor of the agency on a third appeal alleging retaliation).

4

Menoken filed a pair of civil actions in this court against OPM, the Social Security Administration (SSA), and the Department of Health and Human Services (HHS) in January 2016. In the first, Menoken brought Title VII retaliation claims against OPM and SSA, alleging that they manipulated the ALJ selection process in March 2001 to deny her an ALJ position. In the second, Menoken brought Title VII discrimination and retaliation claims against OPM and HHS, alleging that in 2005 they deviated from the normal ALJ selection process by utilizing four small lists of ALJ candidates, rather than one larger list of candidates, as was typical.[4] On August 11, 2017, Judge Amy Berman Jackson of this court issued a consolidated decision and dismissed the first action against OPM and SSA under the doctrines of res judicata and issue preclusion.[5] Menoken v. McGettigan, No. 16-cv-0084 (ABJ), 2017 WL 3479048, at *4–7 (D.D.C. Aug. 11, 2017) (Menoken II). In the second action, the court denied defendants' motion to dismiss the discrimination claims against OPM and HHS and the retaliation claim against OPM, but granted the motion with respect to the retaliation claim against HHS. Id. at *7–10.

### B. Menoken's Disclosure to OSC

OSC is an independent federal investigative and prosecutorial agency headed by the Special Counsel. 5 U.S.C. §§ 1211(a), 1212. OSC handles claims of wrongdoing (i.e., "disclosures") within the executive branch from current federal employees, former employees, and applicants evidencing (1) "a violation of any law, rule or regulation," (2) "gross mismanagement," (3) "a gross waste of funds," (4) "an abuse of authority," or (5) "a substantial and specific danger to public health or safety" at federal agencies. Id. § 1213(a)(1).

---

[4] This alleged conduct its not part of the wrongdoing alleged in this case. See Am. Pet. ¶¶ 7–22.
[5] Menoken has moved for reconsideration of this dismissal. Menoken v. McGettigan, No. 16-cv-0084 (ABJ), Dkt. No. 19.

5

Federal law dictates a specific process that OSC follows for § 1213 disclosures. When the Special Counsel receives a disclosure, she shall review it within 15 days and determine whether there is a "substantial likelihood" that the information discloses one of the five categories of wrongdoing. Id. § 1213(b). If the Special Counsel makes a "positive determination" of a substantial likelihood of wrongdoing, she "shall promptly transmit the information . . . to the appropriate agency head" and require the agency head to conduct an investigation and submit a written report of findings. Id. § 1213(c)(1) (emphasis added), (e)(1). OSC is not authorized to conduct its own investigation of a § 1213 disclosure. See 5 C.F.R. § 1800.2(a). Upon submission by the agency head, the Special Counsel reviews the report for reasonableness and statutory compliance, and provides a copy of the report to the complainant, who may also submit comments. 5 U.S.C. § 1213(e)(1)–(2). The Special Counsel is required to transmit an agency report, any comments provided by the complainant, and any comments or recommendations by the Special Counsel to the President and the congressional committees with jurisdiction over the relevant agency. Id. § 1213(e)(3).

If the Special Counsel does not make a "positive determination," she nonetheless "may transmit the information to the head of the agency" with the consent of the complainant, but is not required to do so. Id. § 1213(g)(2) (emphasis added). If the Special Counsel does not transmit the disclosure, she "shall inform" the complainant of "the reasons why the disclosure may not be further acted on" and "other offices available for receiving disclosures, should the individual wish to pursue the matter further." Id. § 1213(g)(3).

In August 2012, Menoken filed a § 1213 disclosure with OSC, describing an "extraordinary pattern of wrongdoing, committed by OPM and EEOC." Am. Pet. ¶ 23. Menoken claimed specifically that OPM never complied with EEOC's remedial order and "repeatedly violated it

6

(and thus Title VII) by continuing to use, and rely on, the unlawful scoring factor for years after being ordered to 'cease.'" Id. ¶ 18 (emphases omitted); see id. ¶ 38. She also claimed that EEOC "abused its authority by blatantly refusing to enforce" the order, id. ¶ 19—for example, by dismissing her noncompliance appeal in 2003, id. ¶ 21.

On August 15, 2012, Menoken received a call from an OSC attorney who advised her that her disclosure would not be processed "due to OSC's policy of not getting involved in matters relating to EEOC's adjudicatory activities." Id. ¶ 24. Menoken revised her disclosure to clarify that she was "not seeking OSC's help in proving an EEO[C] claim" and that "the wrongdoing in question . . . harmed, not only [Menoken], but the public at large." Id. ¶ 25 (emphasis in original). On September 10, 2012, the same OSC attorney advised Menoken that OSC would not use its §1213 authority to address EEOC's alleged wrongdoing. Id. ¶ 27. By letter dated September 26, 2012, OSC notified Menoken that it had "close[d] the file" on her disclosure and advised her that it would be "more appropriate" to address the alleged wrongdoing with EEOC. Id. ¶ 28.

Menoken sent a letter objecting to OSC's decision, in which she noted the "conspicuous absence of any mention" of a "substantial likelihood" assessment, as required by 5 U.S.C. § 1213(b). Id. ¶ 29. Menoken alleges that OSC's failure to mention the "likelihood question" in its letter evinces OSC's attempt to circumvent the requirements of § 1213. Id. ¶¶ 30–32. Menoken also contends that OSC failed to comply with the law by exempting disclosures of EEOC's wrongdoing from the ministerial mandates of § 1213. Id. ¶ 32.

In 2015, Menoken, with the assistance of counsel, asked OSC to reopen her disclosure "for a proper '1213' review." Id. ¶ 35. Thereafter, Menoken submitted a declaration, with exhibits further supporting the alleged wrongdoing. Id. ¶ 38. OSC "informally" reconsidered the sufficiency of its prior review and advised Menoken that it stood by its original decision. Id. ¶¶ 36,

7

40. In October 2016, Menoken filed this lawsuit against the Special Counsel under the APA, seeking mandamus, declaratory, and injunctive relief requiring OSC to "perform required ministerial acts in response to" her § 1213 disclosure. Id. ¶ 1.

## II. LEGAL STANDARD

Article III of the Constitution restricts the power of federal courts to hear only "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1; see also Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). "Federal courts are courts of limited jurisdiction," and "possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). Absent subject matter jurisdiction over a case, the Court must dismiss it. Fed. R. Civ. P. 12(h)(3); Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006).

"The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (alterations in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)); see also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) ("Standing . . . is a doctrine rooted in the traditional understanding of a case or controversy."). The standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, 136 S. Ct. at 1547.

A plaintiff "bears the burden of showing that he has standing for each type of relief sought," Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009), and a lack of standing constitutes "a defect in [the Court's] subject matter jurisdiction," Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). Because "subject matter jurisdiction focuses on the court's power to hear the claim, a

8

court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." Bradley v. DeWine, 55 F. Supp. 3d 31, 37 (D.D.C. 2010) (internal quotation marks omitted) (quoting Bailey v. WMATA, 696 F. Supp. 2d 68, 71 (D.D.C. 2010)). Nevertheless, the Court must still "accept all of the factual allegations in [the] complaint as true." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alteration in original). The Court need not accept as true, however, legal conclusions couched as factual allegations, nor inferences unsupported by the facts set forth in the complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006). In deciding a Rule 12(b)(1) motion, the Court "may consider materials outside the pleadings," including public records from other proceedings that are the subject of judicial notice. Jerome Stevens Pharms., Inc., 402 F.3d at 1253; see also Peart v. Latham & Watkins LLP, 985 F. Supp. 2d 72, 81 (D.D.C. 2013).

### III. ANALYSIS

OSC argues that Menoken lacks standing and thus her claim must be dismissed because the Court lacks subject matter jurisdiction. See Def.'s Mot. to Dismiss at 13–21. The Supreme Court has established that the "irreducible constitutional minimum" of standing consists of three elements. Lujan, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Id. (citation and internal quotation marks omitted). Second, there must be "a causal connection between the injury and the conduct complained of." Id. That is, the injury must be "fairly . . . trace[able] to the challenged action of the defendant." Id. (alterations in original). Finally, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" by the Court. Id. (citation and internal quotation marks omitted). At the pleading stage,

9

a plaintiff must "clearly . . . allege facts demonstrating" each element. Spokeo, 136 S. Ct. at 1547; accord. Friends of Animals v. Jewell, 828 F.3d 989, 992 (D.C. Cir. 2016). "[A] deficiency on any one of the three prongs suffices to defeat standing." US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

### A. Injury In Fact

OSC first contends that Menoken has failed to establish a cognizable injury in fact. See Def.'s Mot. to Dismiss at 14–17. To do so, Menoken must clearly allege facts showing she suffered "an invasion of a legally protected interest" that is "concrete and particularized." Lujan, 504 U.S. at 560. Here, OSC argues that Menoken merely alleges that OSC failed to comply with statutory requirements for processing her disclosure, but Menoken fails to allege that OSC's statutory noncompliance caused her to suffer any concrete injury.

In Spokeo, the Supreme Court explained that "particularization" and "concreteness" are distinct requirements. See 136 S. Ct. at 1548. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." Id. (internal quotation marks omitted). The plaintiff must show that she "personally has suffered some actual or threatened injury." Id. (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982)). Concreteness requires an injury that is "'de facto'; that is, it must actually exist." Id. (emphasis in original). The Supreme Court further explained that "Article III standing requires a concrete injury even in the context of a statutory violation." Id. at 1549. For that reason, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury in fact requirement of Article III." Id.; see also Summers, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."); Hancock v. Urban Outfitters, Inc.,

10

830 F.3d 511, 514 (D.C. Cir. 2016) ("[T]he Supreme Court cautioned in Spokeo that some statutory violations could result in no harm . . . ." (internal quotation marks omitted)). Hence, to satisfy the injury in fact element, Menoken must allege something more than an interest in having OSC process her disclosure "in a manner that fully accords with the letter and spirit of every applicable provision in § 1213." Am. Pet. at 10; see also Allen v. Wright, 468 U.S. 737, 754 (1984) ("[A]n asserted right to have the government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014).

Two recent decisions applying Spokeo by courts in this Circuit are instructive. First, in Hancock v. Urban Outfitters, Inc., plaintiffs alleged that requests by retail stores for plaintiffs' zip codes when processing credit card transactions violated D.C. consumer protection laws and created an injury sufficient to support standing. 830 F.3d at 512–13. The D.C. Circuit disagreed because plaintiffs failed to allege that they "suffered any cognizable injury as a result of the zip code disclosures"—for example, "any invasion of privacy, increased risk of fraud or identify theft, or pecuniary or emotional injury." Id. at 514. Because plaintiffs had merely alleged "statutory violations [that] result[ed] in no harm," they lacked standing. Id. (citation and internal quotation marks omitted). Next, in Owner-Operator Independent Drivers Association v. United States Department of Transportation, 211 F. Supp. 3d 252 (D.D.C. 2016), a truck drivers' association and five commercial drivers challenged the Department of Transportation's (DOT) maintenance of a federal database containing driver safety data because DOT allegedly breached its statutory duty to ensure the accuracy of the database, id. at 259–60. The court concluded that plaintiffs lacked standing because "even if this amount[ed] to a violation of DOT's statutory responsibilities," plaintiffs did not allege "concrete harm resulting from DOT's actions," such as showing their

11

employment status was adversely affected. Id. at 260. At best, plaintiffs alleged "a bare procedural violation, divorced from any concrete harm." Id. (citation omitted).

In her opposition, Menoken does not engage substantively with OSC's standing argument. Instead, she asserts in a conclusory manner that the Court should reject "as irrelevant and misleading" OSC's standing arguments, expressly disclaims that she is asking the Court to "remedy employment discrimination," and states that "the Amended Petition could not be more emphatic in stating that the action was brought 'as a result of Defendant's arbitrary refusal to comply with 5 U.S.C. § 1213.'" Pl.'s Opp'n [ECF No. 12] at 2 (emphasis in original) (quoting Am. Pet. ¶ 1). The Amended Petition is replete with similar allegations of the Special Counsel's statutory noncompliance, including that she: "refused to process [Menoken's disclosure], as required, under § 1213(b)" and "exceeded her authority when she 'closed the file' on Plaintiff's Disclosure," Am. Pet. ¶ 2; failed to complete a "substantial likelihood" assessment as required by § 1213(b), id. ¶ 29; "circumvent[ed] the ministerial mandates of § 1213(c)," id. ¶ 30; and "avoid[ed] the ministerial acts required by subsection (c) of § 1213 by ignoring the ministerial acts required by subsection (b)," id. ¶ 31. But under Spokeo and Hancock, it is clear that these "bare procedural violations" are insufficient by themselves to establish standing.

Instead, Menoken must plausibly allege that the Special Counsel's asserted noncompliance with § 1213 caused her to suffer a concrete injury. Despite Menoken's failure to address this point in her opposition, the Amended Petition can be read to present three alternative bases for finding an Article III injury. Unfortunately for Menoken, none provide her with standing. Menoken first broadly alleges that she was "tangibly injured by corruption and abuse in the executive branch." Am. Pet. ¶ 44. Although this allegation does not specify any tangible injury, the Amended Petition alleges that Menoken suffered ongoing harm—namely, her nonselection for an ALJ position—

from OPM's administration of the 1993 ALJ examination, OPM's continued noncompliance with the EEOC remedial order, and EEOC's refusal to enforce that order.[6] See id. ¶¶ 15, 18–22, 38–39. Normally, at the pleading stage, a plaintiff need only allege facts that, if true, would constitute an injury in fact. Lujan, 504 U.S. at 561. And nonselection as an ALJ could normally suffice for such an injury. But here, Menoken has already litigated this asserted injury, and has lost on the merits.[7] See Menoken I, 605 F. Supp. 2d at 149 (granting summary judgment in favor of OPM on all claims), aff'd sub nom. Menoken v. Berry, 408 F. App'x 370 (D.C. Cir. 2010). The doctrine of issue preclusion bars Menoken from relitigating the fact of OPM's alleged noncompliance and any resulting injuries that she allegedly suffered.[8] See Menoken II, 2017 WL 3479048, at *6 (dismissing Menoken's retaliation claim against SSA based on issue preclusion because allegation that SSA colluded with OPM to hide noncompliance with the EEOC remedial order had already been litigated and decided in earlier lawsuit).

---

[6] The Court considers whether these allegations create standing despite Menoken's statement in her opposition that she is not "asking the Court to remedy employment discrimination." See Pl.'s Opp'n at 12.

[7] Compare Am. Pet. ¶ 15 ("OPM was further required to appropriately raise the scores of African Americans on the ALJ 'Register' who (like Plaintiff) were presumptively harmed by the racial barriers embedded in the ALJ examination."), and id. ¶ 18 ("OPM never complied with the Menoken Order, and, indeed, repeatedly violated it . . . by continuing to use, and rely on, the unlawful scoring factor for years after being ordered to 'cease.'"), and id. ¶ 38 ("OPM violated § 717(a) and (b) of Title VII by virtue of its . . . failure to comply with the Menoken Order . . . ."), with Amended Complaint at 11, Menoken I, 605 F. Supp. 2d 148 (No. 03-cv-1775), ECF No. 8 ("[OPM] has violated Title VII by repeatedly and deliberately failing to comply with EEOC Orders requiring that she 'cease' and correct discrimination against African American ALJ applicants."), and id. ("[OPM] has violated, and continues to violate, Title VII by . . . unlawfully discriminating against African American applicants in general, and plaintiff in particular, by virtue of the design, implementation and/or administration of the ALJ examination.").

[8] The Amended Petition could also be read to allege "corruption and abuse" in the form of whistleblower retaliation, see Am. Pet. ¶¶ 20, 22, but this allegation is inapposite to Menoken's challenge to the processing of her § 1213 disclosure. Whistleblower retaliation claims are brought under § 1214, and Menoken does not allege that she has presented a § 1214 claim to OSC. See id. ¶ 23 ("Plaintiff filed a Disclosure pursuant to § 1213 . . . ."); Pl.'s Opp'n at 4 (noting Menoken filed a § 1213, not a § 1214, complaint). Nor does Menoken allege that her § 1213 claim concerned retaliation. See Am. Pet. ¶¶ 23–40. Moreover, Menoken's allegations that EEOC "advance[d] OPM's retaliatory interest" and created a "hostile work environment" are "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements," which are insufficient to allege Article III injury. Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (alterations in original); see also Iqbal, 556 U.S. at 678 (pleading must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" (citation omitted)).

13

"Issue preclusion, or collateral estoppel, bars 'successive litigation of an issue of fact or law [1] actually litigated and [2] resolved in a valid court determination [3] essential to the prior judgment.'" Swanson Grp. Mfg. LLC v. Jewell, 195 F. Supp. 3d 66, 72 (D.D.C. 2016) (quoting New Hampshire v. Maine, 532 U.S. 742, 748–49 (2001)). Issue preclusion bars successive litigation even if the issue recurs in the context of a different claim, see Taylor v. Sturgell, 553 U.S. 880, 892 (2008), and it does not require mutuality of parties, see Gov't of Rwanda v. Johnson, 409 F.3d 368, 374 (D.C. Cir. 2005). Moreover, preclusion "must not work a basic unfairness to the party bound by the first determination." Martin v. U.S. Dep't of Justice, 488 F.3d 446, 454 (D.C. Cir. 2007) (citation omitted).

In her prior civil action in this court, Menoken litigated claims that OPM violated Title VII by failing to comply with the EEOC remedial order, requiring it to cease using the partner benchmark and correct discrimination against African American ALJ applicants, including herself. See Menoken I, 605 F. Supp. 2d at 151. Following protracted discovery, the court determined that OPM provided "abundant admissible evidence substantiating its full compliance with [EEOC's] order to cease and correct the discrimination caused by the partner benchmark," and on that basis, granted summary judgment to OPM. Id. at 152. It is beyond dispute, then, that the issue of whether Menoken was injured by OPM's alleged failure to comply with the remedial order has been contested, submitted for judicial determination, and actually decided. Menoken is simply wrong that OSC "cannot point to any finding by any court that OPM undertook any of the corrective measures mandated by the Menoken Order." Pl.'s Opp'n at 3. The Court can conceive of no reason (nor has Menoken supplied one) that precluding further litigation of this issue works any

unfairness against her. Hence, Menoken is precluded from relitigating this issue, and she cannot rely on this alleged injury to establish Article III standing.[9]

Menoken next asserts that "as a member of the public, she has a concrete interest in protecting herself, and others, from the potentially dire consequences of the executive branch's systematic unwillingness to embrace Congress' policy of promoting integrity and accountability in governmental activities." Am. Pet. ¶ 44. It is well established that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws . . . does not state an Article III case or controversy." Lujan, 504 U.S. at 573–74; see also Hollingsworth v. Perry, 133 S. Ct. 2652, 2662 (2013) ("We have repeatedly held that such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing."); Bernstein v. Kerry, 962 F. Supp. 2d 122, 128 (D.D.C. 2013) ("[S]tanding cannot be based on plaintiffs' interest, common among all citizens, in the government following the law."), aff'd, 584 Fed. App'x 7 (D.C. Cir.) (mem.). As the Supreme Court stated unequivocally in Allen v. Wright, "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." 468 U.S. at 754; accord. Williams v. Lew, 819 F.3d 466, 475 (D.C. Cir. 2016). Menoken's interest in protecting herself and the public from the executive branch's alleged unwillingness to follow the law, then, does not constitute a concrete injury sufficient for Article III standing.

Finally, Menoken alleges that "as an executive branch employee charged with a duty to disclose wrongdoing" she "has a right to be taken seriously and to turn to the judiciary to compel

---

[9] Indeed, Menoken acknowledges in the Amended Petition that she raised the same questions of OPM's alleged noncompliance before this court and the D.C. Circuit. See Am. Pet. ¶ 38, 41. Menoken's allegation that OPM misled the district court and D.C. Circuit into believing it had fully complied with EEOC's order, see id. ¶¶ 38–39, 41; Pl.'s Opp'n at 3, does not shield her from issue preclusion. A party may seek relief from a final judgment on the basis of "newly discovered evidence" or "fraud . . . misrepresentation, or misconduct by an opposing party" by filing a motion under Federal Rule of Civil Procedure 60(b), not by seeking to relitigate the underlying issue through claims brought in a different lawsuit.

15

the executive branch, through OSC, to process her Disclosure in the precise manner that Congress prescribed." Am. Pet. ¶ 44. But violation of a "right to be taken seriously" does not constitute a concrete harm, and this allegation is merely a different formulation of Menoken's asserted right to have the government follow the law. Allen, 468 U.S. at 754. Hence, this too fails to satisfy the injury in fact element.[10]

### B. Traceability

OSC next argues that Menoken fails to establish the causation element of standing because she does not allege a "fairly traceable connection between [her] injury and the complained-of conduct of [OSC]." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998); see Def.'s Mot. to Dismiss at 17–19. Menoken does not directly respond to this argument in her opposition. The traceability requirement ensures that a plaintiff's asserted injury was caused by the defendant and "not the result of the independent action of some third party not before the court." Arpaio, 797 F.3d at 19 (quoting Lujan, 504 U.S. at 561). "Although 'standing is not precluded' in a case that turns on third-party conduct, 'it is ordinarily substantially more difficult to establish.'" Id. at 20 (quoting Lujan, 504 U.S. at 562); Am. Freedom Law Ctr. v. Obama, 821 F.3d 44, 48–49 (D.C. Cir. 2016) ("When '[t]he existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,"' it becomes '"substantially more difficult" to establish' standing.")[11]. The D.C. Circuit has required

---

[10] Menoken also alleges that OPM's alleged noncompliance "upend[ed] the lives of more than a half a million people seeking adjudications in the Social Security Administration's disability claims process." Am. Pet. ¶ 26 (emphases omitted). But she does not allege that she filed a Social Security disability claim, so this cannot constitute an injury in fact for her. See Spokeo, 136 S. Ct. at 1548 (plaintiff must show that she "personally has suffered some actual or threatened injury" (emphasis added) (citation omitted)).

[11] See also Fulani v. Brady, 935 F.2d 1324, 1330 (D.C. Cir. 1991) ("[T]his Court has denied standing where the plaintiff seeks to change the defendant's behavior only as a means to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury." (citation, internal quotation marks, and emphasis omitted)).

16

"substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." Arpaio, 797 F.3d at 20 (quoting Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 941 (D.C. Cir. 2004)). In other words, Menoken must show that "absent the [OSC's] allegedly unlawful actions" there is a "substantial probability" that she would "not be injured." Chamber of Commerce v. EPA, 642 F.3d 192, 201 (D.C. Cir. 2011) (citation omitted); Welborn v. IRS, 218 F. Supp. 3d 64, 78 (D.D.C. 2016). She has not done so.

Menoken does not allege anywhere in her Amended Petition that OSC's failure to comply with § 1213 in processing her disclosure caused her to suffer any actual injuries. Rather, she expressly attributes her alleged injuries to actions by OPM and EEOC, two third-parties not now before the Court. See, e.g., Am. Pet. ¶ 18 ("OPM never complied with the Menoken Order, and, indeed, repeatedly violated it (and thus Title VII) by continuing to use, and rely on, the unlawful scoring factor for years after being ordered to 'cease.'" (emphasis in original)); id. ¶ 19 ("EEOC abused its authority by blatantly refusing to enforce the Menoken Order . . . ."); id. ¶ 23 ("The Disclosure described an extraordinary pattern of wrongdoing, committed by OPM and EEOC . . . ." (emphasis added)). The entire section of the Amended Petition describing the "historical context of the wrongdoing in question," id. ¶¶ 7–22, only identifies harm caused by OPM and EEOC, not by OSC. Even accepting that Menoken suffers ongoing harm, she merely alleges that OSC failed to comply with the requirements of § 1213, but she does not attempt to plead any facts tracing OSC's noncompliance to any ongoing harm she suffers. Hence, she has failed to clearly allege facts demonstrating the causation element required for standing.

**C. Redressability**

OSC finally argues that Menoken fails to show a "likelihood that the injury will be redressed by a favorable decision on the merits." Freedom Republicans, Inc. v. FEC, 13 F.3d 412, 415 (D.C. Cir. 1994) (citing Lujan, 504 U.S. at 561); Def.'s Mot. to Dismiss at 20. To do so, Menoken must offer "more than a bald allegation" of redressability and instead allege facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff [seeks]." Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs., 489 F.3d 1267, 1275 (D.C. Cir. 2007). If a plaintiff relies on a "chain of allegations," the court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." Arpaio, 797 F.3d at 21 (quoting United Transp. Union v. ICC, 891 F.2d 908, 912 (D.C. Cir. 1989)).

Nowhere does Menoken allege that the relief she seeks will provide her with any remedial benefit. Nor can the Court "confidently predict any causal connection between a possible judicial response and the redress of" Menoken's injuries. Freedom Republicans, 13 F.3d at 419. Menoken seeks an order "compelling [OSC] . . . to reopen [her] Disclosure for expedited processing in a manner that fully accords with the letter and spirit of every applicable provision in § 1213." Am. Pet. at 10. If this Court were to rule for Menoken and grant the requested relief, her alleged injuries would be redressed only if: (1) OSC made a positive determination of wrongdoing and forwarded the disclosure to the agency heads; (2) OPM and EEOC prepared reports at odds with their consistently held positions, and the earlier holding of this court and the D.C. Circuit, finding no evidence of noncompliance; (3) those reports resulted in some change to the ALJ examination results and selection process; and (4) that change would remedy Menoken's alleged injuries.[12] But

---

[12] OSC is not authorized to itself investigate any wrongdoing in a § 1213 disclosure; rather, it can only refer a disclosure to an agency and require an investigation and report by that agency. See 5 U.S.C. § 1213(c).

18

because this chain of events is entirely speculative, Menoken has not plausibly alleged a substantial likelihood that her injuries will actually be remedied by the Court's action. See Bernstein, 962 F. Supp. 2d at 129 ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (internal quotation marks omitted) (quoting Lujan, 504 U.S. at 561)). In her opposition, Menoken argues that "[i]n a political environment currently focused on 'draining the swamp' in government, the Court should not assume that granting [her] relief in this action will not advance important policy goals or otherwise have meaningful effect." Pl.'s Opp'n at 5 (emphasis added). But the burden is on Menoken to plausibly allege a likelihood that granting her requested relief will remedy her injuries. She has not done so in this case; thus, on the record here she has failed to establish the redressability element required for standing.[13]

## CONCLUSION

In sum, Menoken has not shown injury, causation, or redressability. She thus has no standing, and her suit will be dismissed for a lack of subject matter jurisdiction. The Court need not address OSC's alternative grounds for dismissal. A separate Order accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: September 14, 2017

---

Thereafter, OSC must review the agency's report for reasonableness, and it may provide comments and recommendations of its own. Id. § 1213(e).

[13] Menoken also cites Weber v. United States, 209 F.3d 756 (D.C. Cir. 2000), for the proposition that the Court has jurisdiction to entertain this action. Pl.'s Opp'n at 4. In Weber, the plaintiff filed a complaint pursuant to 5 U.S.C. § 1214 with OSC for a prohibited personnel practice—the Army's alleged revocation of his security clearance in retaliation for his whistleblowing—and OSC declined to investigate his complaint under § 1214. 209 F.3d at 757–58. The D.C. Circuit concluded that a district court has subject matter jurisdiction to issue a writ of mandamus against OSC if it determines that OSC violated a non-discretionary statutory duty to investigate allegations of a prohibited personnel practice under § 1214. Id. at 759. Weber did not involve the question whether the plaintiff had sufficiently pled the elements of Article III standing.

19